AARON D. FORD
  Attorney General
SAMUEL L. PEZONE, JR. (Bar No. 15978)
  Deputy Attorney General
State of Nevada
Office of the Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, Nevada 89101
(702) 486-4070 (phone)
(702) 486-3773 (fax)
Email: spezone@ag.nv.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| LEANDRE MARTELL, | Case No. 2:22-cv-00858-RFB-BNW |
| Plaintiff, | |
| v. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| JULIE WILLIAMS, *et al.*, | |
| Defendants. | |

Defendants, Richard Houck (Houck) and Julie Williams (Williams) (collectively "Defendants"), by and through counsel, Aaron D. Ford, Nevada Attorney General, and Samuel L. Pezone Jr., Deputy Attorney General, of the State of Nevada, Office of the Attorney General, hereby move for summary judgment pursuant to Fed. R. Civ. P. 56.

## I.    PROCEDURAL HISTORY

This is a pro se inmate civil rights action brought by Plaintiff, Leandre Martell (hereinafter "Martell") asserting claims arising under 42 U.S.C. § 1983. *See* ECF No. 4. After performing mandatory screening, this Court allowed Martell to proceed on the following claims: a First Amendment retaliation claim against Richard Houck for allegedly refusing to process Martell's follow-up grievances regarding good time credits; and a First Amendment retaliation claim against Richard Houck for allegedly refusing to process Martell's grievances in retaliation for Martell's alleged verbal and written complaints against Houck, and against Julie Williams for her failure to intervene.

## II.    SUMMARY OF THE ARGUMENT

Martell failed to exhaust his available administrative remedies. Martell failed to appeal the overdue response to his only informal grievance when he had the opportunity. Accordingly, his claims against Defendants are procedurally barred.

Martell cannot establish Defendants violated his First Amendment rights. Martell cannot prove Houck refused to accept his grievance, or that he went out of his way to intercept his grievance submitted to the unit lockbox. Likewise, Martell cannot prove Julie Williams acquiesced in these acts, as she was not aware of these acts and had no reason to know.

Moreover, no reasonable juror could find that a grievance to the Offender Management Division about credit calculation, a process which had nothing at all to do with a case work specialist, would motivate Houck to refuse to accept an inmate's grievance, let alone intercept Martell's grievance from the unit lockbox. Defendants also lacked notice that their alleged actions would constitute a constitutional violation as it was not clearly established law at that time. Thus, Defendants are entitled to summary judgement on the merits of Martell's claim and the issue of qualified immunity.

Defendants are entitled to summary judgement on all of Martell's requested remedies. Martell's requests for compensatory damages stemming from his term of confinement are barred by *Heck v. Humphrey*. Martell's request for punitive damages lacks merit because Martell cannot prove either Defendant violated his rights with malice, express or implied, by clear and convincing evidence. Because Martell's prison term has expired, his request for injunctive relief relating to his prison term is moot.

## III.    MARTELL'S ALLEGATIONS

Martell alleged that he filed Grievance No. 2006-31-29079 (Grievance 29079) on September 6, 2021, about calculating credits related to his sentence. ECF No. 4 at 4. Martell alleged that he received a notice of rejection through Houck on December 3, 2021, but that Houck refused to accept a resubmission of this grievance because his grievance concerned credit calculation. *Id.*

Martell then alleged that on January 21, 2022, Houck returned the grievance Martell had resubmitted in 29079 on December 3, 2021, stating the grievance had been denied. ECF No. 4 at 5. However, Martell alleged there was no improper grievance memo with the returned grievance. *Id*. Martell alleged that he brought these issues to the attention of Williams through a "Sgt. Clayton," but that Williams instructed Martell to submit his grievance through Houck. *Id*. at 5-6. Martell alleged on January 24, 2022, that he gave his resubmission of Grievance 29079 and a separate grievance against Houck to Sgt. Clayton to submit via the unit's lockbox, but that these grievances were never processed because Houck withheld them. *Id*. at 6.

## IV. STATEMENT OF UNDISPUTED FACTS

### A. Martell's Convictions

Martell was incarcerated with the Nevada Department of Corrections following his guilty plea and sentencing in two state cases. Ex. A – Judgement of Conviction in Case No. C-21-356786-1 & Ex. B - Judgement of Conviction in Case No. C-21-356464-1. Specifically, Martell pled guilty to "Battery Constituting Domestic Violence – Strangulation," a "Category C Felony," and was sentenced to a minimum of twelve (12) months and a maximum of thirty (30) months, with eighty-six days credit for time served, Ex. A, as well as Attempt Coercion, a "Category C Felony," and was sentenced to a minimum of twelve (12) months and a maximum of thirty (30) months, with one hundred (100) days credit for time served. Ex. B. Both sentences were to run concurrently, meaning both sentences would begin to run at the same time from the date of Martell's sentencings on August 25, 2021, and August 31, 2021. *See* Ex. A & B.

### B. Incarceration and Housing

Martell was initially received and housed at High Desert State Prison (HDSP) on September 2, 2021. Exhibit C – Historical Bed Assignments. He was housed in Unit 2 at HDSP from September 27, 2021, until his transfer to Southern Desert Correctional Center (SDCC) on February 17, 2022. *Id*. Martell remained at SDCC until he was discharged from

custody on or about August 24, 2022. *Id*. In total, Martell spent only 356 days, less than a year, in the custody of the Nevada Department of Corrections. *Id*.

### C. Statutory Good Time Credits

"The NDOC's Offender Management Division (OMD) Sentence Management section is responsible for recording inmate sentences and calculating parole eligibility and discharge dates." Ex. D – Declaration of Holly Skulstad at ¶3. "The staff at OMD are the only individuals who apply statutory credits to offenders' sentences. The Wardens, Associate Wardens, and caseworkers do not calculate or apply statutory credits to offenders' sentence structures." *Id*. at ¶6.

When OMD applies statutory credits to an eligible sentence, credits are applied to the minimum term, which is the parole eligibility date, the maximum term, which is the expiration date, or both depending upon the nature of the underlying conviction. Nev. Rev. Stat. § 209.4465 requires OMD to allocate "statutory good time credit" or "stat time" to an inmate's eligible sentences as follows:

> 1.  An offender who is sentenced to prison for a crime committed on or after July 17, 1997, who has no serious infraction of the regulations of the Department, the terms and conditions of his or her residential confinement or the laws of the State recorded against the offender, and who performs in a faithful, orderly and peaceable manner the duties assigned to the offender, must be allowed:
>     (a)  For the period he is actually incarcerated pursuant to his sentence;
>     (b)  For the period the offender is in residential confinement; and
>     (c)  For the period the offender is in the custody of the Division of Parole and Probation of the Department of Public Safety pursuant to NRS 209.4886 or 209.4888,
>
>     a deduction of 20 days from his sentence for each month he serves.
>
> \*\*\*
>
> 7.  Except as otherwise provided in subsections 8 and 9, Credits earned pursuant to this section:
>     (a)  Must be deducted from the maximum term imposed by the sentence; and
>     (b)  Apply to eligibility for parole unless the offender was sentenced pursuant to a statute which specifies a

> minimum sentence that must be served before a person becomes eligible for parole.[1]
>
> 8.    Credits earned pursuant to this section by an offender who has not been convicted of:
> (c)    Any crime that is punishable as a felony involving the use or threatened use of force or violence against the victim;
> (d)    A sexual offense that is punishable as a felony; and
> (e)    A violation of NRS 484C.110, 484C.120, 484C.130 or 484C.430 that is punishable as a felony; or
> (f)    A category A or B felony,
> apply to eligibility for parole and, except as otherwise provided in subsection 9, must be deducted from the minimum term or the minimum aggregate term imposed by the sentence, as applicable, until the offender becomes eligible for parole and must be deducted from the maximum term or the maximum aggregate term imposed by the sentence, as applicable.

Nev. Rev. Stat. § 209.4465. "When sentences eligible for statutory credit are run concurrently, eligible credits earned during the pendency of all concurrent sentences are normally applied to each and every sentence." Ex. D at ¶5.

"OMD utilizes the Offender Sentence Management System (OSM) to enter and calculate an inmate's credits toward their sentences, and thereby ascertain their sentences individual parole eligibility date and expiration date." Ex. D at ¶7. Earned credits toward an individual sentence are reflected on the Credit History Report generated for each sentence. *Id*. at ¶8. "On these reports, statutory good time credits are coded as "STAT" credits; where the sentence and offender are eligible for statutory credit, the report will show the inmate earning a projected 20 statutory good time credit for each month OSM projects their sentence to run." *Id*.

The Credit History Reports for concurrent sentences in C-21-356786-1 and C-21-356464-1 reflect that Martell began his sentences on August 26, 2021, and August 23, 2021. Ex. D at ¶10; Ex. E; Ex. F. "Martell's sentence in C-21-356464-1 was for 'Attempt Coercion,' a felony which can involve the 'use of violence' or attempts 'to intimidate...by threat of force' against a victim. Martell's sentence in C-21-356786-1 was for 'Battery Constituting

---

[1]  1997 Nev. Stat., 641, § 4, at 3175.

Domestic Violence – Strangulation,' a felony which by its very nature implies use of violence against the victim. *See*." *Id*.

Martell's convictions for "Attempt Coercion" and "Battery Constituting Domestic Violence – Strangulation" are both felonies involving elements of violence or threatened violence against a victim. *See* Nev. Rev. Stat. §§ 207.190 & NRS 200.481. "As both convictions were for "felon[ies] involving the use or threatened use of force or violence against the victim," both fall under NRS 209.4465(8)(a), and both sentences were only eligible to earn statutory good time credits toward the sentences' expiration dates—not toward the parole eligibility dates." Ex. D at ¶11.

"The Credit History Reports reflect that from the dates of sentencing going forward, Martell received 20 statutory good time credits every month towards his sentence expiration date in compliance with NRS 209.4465(1). The reports do not reflect that these credits were ever forfeited due to disciplinary sanctions or misconduct by Martell." Ex. D at ¶12.

Neither OMD nor NDOC determine Martell's convictions or what credit those convictions entitle him to—and neither can change Martell's conviction by grievance. *Id*. at ¶13. Martell's "only recourse would have been to file an appeal or some form of writ regarding his convictions." *Id*. "[I]f any of Martell's grievances regarding good time credit had been referred to OMD for a response, OMD's response would have been that Martell was receiving all of the good time credit his convictions render him eligible for." *Id*. at ¶12.

### D.    NDOC Administrative Regulation ("AR") 740

AR 740 is the regulation NDOC inmates must use to resolve addressable grievances and claims. Ex. G – AR 740 eff. 2018-11-20. Only inmates' claims arising out of, or relating to, issues within the authority and control of the Department may be submitted for review and resolution. *Id*. at 740.03(3).

#### 1.    General Requirements

AR 740 contains three levels of grievance procedures before an inmate exhausts their administrative remedies; that is, the informal level, a first level appeal, and a second

level appeal. *See* Ex. H at 740.8 – 740.10. An inmate whose grievance is denied may file an appeal of the grievance to the next level. *Id*. at 740.03(6). The inmate must file their appeal within five calendar days of their receipt of a response. *Id*. at 740.08(12)(A), 740.09(5)(A).

Not including transmittal time, respective staff will have forty-five (45) days to respond to an informal grievance, forty-five (45) days to respond to a first level grievance, and sixty (60) days to respond to a second level grievance. *Id*. at 740.08(12), 740.09(5), 740.10(4). If a response from the institution is overdue, then the inmate may immediately proceed to the next grievance level. *Id*. at 740.03(8).

### 2.    *Rejection of Grievances*

An inmate's grievance "will not be accepted" for reasons "including, but not limited to" those contained in AR 740.03. Ex. H at 740.03(4). An inmate whose grievance "is not accepted" pursuant to AR 740 "or not within the intended scope of" AR 740 may not proceed to the next procedural level. *Id*. at 740.03(5).

### 3.    *Grievance Submission*

All units at every institution must contain "locked boxes where all inmates have access to submit their grievances directly to the box." *Id*. at 740.02(2). These "[l]ock boxes will be maintained in segregation/max units in a manner in which the inmate will be allowed to have direct access." *Id*. at 740.02(2)(A). However, "[a] designated staff may go cell to cell to pick up grievances in segregation/max units due to security and safety concerns, if necessary." *Id*. Unit 2, as a transitional housing unit, allows direct access to the unit lock box at which inmates can submit their grievances. Ex. H – HDSP Operational Procedure 740 at 740.02(1).

Grievances are "treated as legal correspondence and will be gathered daily, Monday through Friday, excluding holidays, by the AW or designated Grievance Coordinator(s) and or designated staff member." Ex. G at 740.01(3); Ex. H at 740.02(1). At HDSP, the Associate Warden of Programs (AWP) and assigned Case Work Specialists (CCS), are responsible for collecting these grievances and delivering them to an operations lockbox. *Id*.

### 4.    Grievance Records

Pursuant to AR 740, "[a]ll grievances, whether accepted or not, will be entered into NOTIS," the Nevada Offender Tracking Information System. Ex. G at 740.01(1). Paper grievances will be "stored at the facility/institution where the grievance issue occurred." *Id.* at 740.02(1). However, all rejections or responses to a grievance "shall be stored in NOTIS." *Id.*

At HDSP, the AWP's administrative assistant will enter newly submitted grievances into NOTIS and deliver the grievances to the AWP for review in the AWP's capacity as Grievance Coordinator. Ex. H at 740.02(1). The AWP's assistant will also enter any subsequent response or rejection into NOTIS. *Id.* Using this data, NOTIS can generate a printable PDF report containing the history of all grievances and grievance responses for a given inmate. *See* Ex. I – Grievance History Report.

Responses or rejections of grievances are entered into NOTIS by the AWPs assistant. Ex. H at 740.02(1). Copies of the grievance with copies of the attached response or DOC 3098 are provided to the unit's assigned CCS, who will deliver the document to the inmate for his signature. *Id.*

### E.    Martell's Grievances

#### 1.    Grievance No. 2006-31-29079

On September 6, 2021, Martell submitted an informal grievance in Grievance No. 2006-31-29079 (Grievance 29079), inquiring as to the availability of statutory good time credits in light of a recent alleged plea bargain. Ex. J – Grievances 29079. On December 3, 2021, Martell signed for receipt of an Improper Grievance Memo (DOC 3098), which rejected his informal grievance for failure to demonstrate a loss or harm and state a remedy pursuant to NDOC Administrative Regulation (AR) 740.03(1)(a). *Id.* The memo also referred Martell to AR 740.01(2), which instructs inmates to submit their grievances directly to a secure lock box in their unit. *Id.* Martell was instructed that he could re-submit his grievance within 5 days after correcting these deficiencies. *Id.* Contrary to Martell's allegations, there is no record that he resubmitted this grievance. *Id.*; Ex. I at 2.

### 2. *Grievance No. 2006-31-30791*

Instead, on November 11, 2021, Martell submitted a second level grievance in Grievance No. 2006-31-30791 (Grievance 30791) regarding the same issue. Ex. K – Grievance 30791. On December 1, 2021, Williams issued a DOC 3098 stating that Martell had failed to file or attach to his second level grievance any informal or first level grievance in Grievance 30791. *Id*. The memo instructed Martell to resubmit at the informal level or with any prior informal and first level grievances attached. *Id*.

While there is signature indicating Martell's receipt of the DOC 3098, there is also no indication whether the DOC 3098 was ever transmitted back to Houck. *Id*. There is no indication that Martell resubmitted this grievance. *Id*.; Ex. I at 2.

### 3. *Grievance No. 2006-31-38728*

On April 25, 2022, Martell submitted an informal grievance in Grievance No. 2006-31-38728 (Grievance 38728) regarding his retaliation claim against Houck. Ex. L – Grievance 38728. His grievance was received at Southern Desert Correctional Center on April 28, 2022. *Id*.

At some point his grievance was referred to Williams at HDSP for a response. Ex. I at 1. It appears a DOC 3098 was issued sometime after Martell was discharged, instructing Martell that his informal grievance failed to state any loss or remedy and was not to be used as a kite. *Id*. No address was on file to forward the memo and return the grievance to Martell. *Id*. Between April 28, 2022, and his discharge on August 24, 2022, Martell did not file any other grievances at SDCC related to his claims. *See Id*.

## F. Houck's Declaration

Defendant Richard Houck was a CCS I assigned to Unit 2 at HDSP. Ex. M – Declaration of Richard Houck at ¶¶2, 4. As CCS, Houck was responsible "for collecting grievances from the unit's grievance lockbox daily and delivering these directly to operations," as well as "returning inmates their grievances that had received a response or a rejection notice." *Id*. at ¶4.

"While the general practice among inmates was to submit their grievances to the unit lockbox, inmates submitting them through staff was not unheard of." *Id.* at ¶6. Houck declares that on the few occasions he "was asked by an inmate to accept a new grievance or a resubmission," he "never refused to accept any inmate's grievance in this manner." *Id.* Houck "would never have withheld a grievance in lieu of delivering it to operations, even if it did concern [him]." *Id.* In any event, Houck does not recall ever being handed a grievance by Martell. *Id.* at ¶7.

Martell's credit calculation grievances contained no allegations about and had nothing to do with Houck. *Id.* at ¶¶8-9 As a CCS, Houck declares that he was not involved in, nor responsible for the calculation of an offender's credits toward their sentence—OMD is responsible for performing and ensuring the accuracy of these calculations. *Id.* Houck admits that he knows nothing about how good time credits are applied or calculated. *Id.* Thus, Houck would have no reason to refuse to accept, attempt to intercept, or otherwise interfere with Martell's grievances regarding credit calculation. *Id.* at ¶9.

### G.    William's Declaration

Julie Williams was previously Associate Warden of Programs, and she served as Grievance Coordinator in that capacity from December of 2021 until she became Associate Warden of Operations in 2023. Ex. N – Declaration of Julie Williams at ¶¶3-5. Williams has no recollection of any conversation or any correspondence with Martell regarding his grievances, or about any issue Martell may have had with Houck. *Id.* at 19. Williams never received any notification from Sgt. Clayton, who would not have been in her chain of command and may not have been assigned to Unit 2. *Id.* at ¶¶14-16, 19. The first time she ever heard of Martell's complaints about Houck was when she reviewed Grievance 38728 sometime after Martell was released.

## V.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The "purpose of summary judgment is to pierce the

pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

Summary judgment allows courts to avoid unnecessary trials when there is no dispute as to the facts. *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The purpose of summary judgment is to isolate and then terminate claims that are factually unsupported. *Id.* at 323–24. A moving party is not required to disprove the non-moving party's claims. *Id.* Instead, the moving party is simply required to point out the absence of evidence supporting the non-moving party's claims. *Id.*

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact does indeed exist. *Matsushita*, 475 U.S. at 586. Material facts are facts that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The court should not consider disputes concerning irrelevant or unnecessary facts. *Anderson,* 477 U.S. at 248.

The opposing party is not permitted to merely rely upon its pleadings; it must tender evidence of specific facts which create a genuine issue of material fact. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n. 11; *Anderson,* 477 U.S. at 255. The opposing party is not required to establish a material issue of fact conclusively as it is enough that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, *Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 631 (9th Cir. 1987). The evidence of the non-moving party is to be believed, and all reasonable inferences must be drawn in favor of the opposing party. *Matsushita*, 475 U.S. at 587 (citations omitted); *Anderson*, 477 U.S. at 255.

However, reasonable inferences are not drawn out of the air; it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F. Supp. 1224, 1244–45 (E. D. Cal. 1985), *aff'd*, 810 F.2d 898,

902 (9th Cir. 1987). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *T.W. Elec. Serv.*, 809 F.2d at 631. The court is concerned with establishing the existence of genuine issues, and "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

The facts are only "viewed in the light most favorable to the nonmoving party if there is a 'genuine' dispute as to those facts." *Scott v. Martell*, 550 U.S. 372, 380 (2007). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.,* (quoting *Matsushita*, 475 U.S. at 586–87). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*.

## VI.  LEGAL ARGUMENTS

### A.    Martell Failed to Exhaust his Administrative Remedies

#### 1.    The Prison Litigation Reform Act ("PLRA")

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Ninth Circuit has clarified that § 1997e(a) requires the complete exhaustion of administrative remedies before a civil complaint is filed. *McKinney v. Carey*, 311 F.3d 1198, 1199 (9th Cir. 2002). "Exhaustion subsequent to the filing of suit will not suffice." *Id*. (citing *Booth*, 532 U.S. at 738).

Exhaustion of administrative remedies requires an inmate to use "all steps the agency holds out and [to do] so properly." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedures

because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91.

Exhaustion protects an administrative agency's authority; it "gives an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court,' and it discourages 'disregard of [the agency's] procedures.'" *Id.* at 89 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)). The PLRA's administrative exhaustion requirement also promotes judicial economy by "reduc[ing] the quantity and improv[ing] the quality of prisoner suits." *Id.* at 93 (quoting *Porter v. Nussle*, 534 U.S. 516, 524 (2002)).

### 2. *NDOC AR 740 Eff. April 28, 2022*

To exhaust administrative remedies, an inmate must complete the grievance procedures set forth in NDOC Administrative Regulation (AR) 740, which include an informal grievance, AR 740.08, a first-level grievance, AR 740.09, and a second-level grievance, AR 740.010. *See* Ex. O – AR 740 eff. 2022-04-28. An inmate must appeal a grievance response within 5 days of receipt of a response. *Id.* at 740.08(12)(A), 740.09(5)(A). However, an inmate may proceed to the next grievance level if a response at the informal or first level is overdue. *Id.* at 740.03(9)(B). A response to an informal grievance or first level grievance is due within 45 days of receipt by the grievance coordinator. *Id.* at 740.08(12).

### 3. *Martell failed to full grieve his retaliation claim*

Martell's informal grievance in Grievance 38728 was received at SDCC on April 28, 2022. Ex. L. After June 12, 2022, Martell could have appealed his grievance to the first level. *Id.* If he had filed a first level appeal by that date, he could have appealed to the second level after July 27, 2022. *Id.* He never filed any appeal. *Id.*; *See* Ex. I.

Martell had the opportunity but failed to appeal the lack of response to his informal grievance. Martell was required to exhaust all available avenues to obtain a remedy. *See Woodford*, 548 U.S. at 90. Martell failed to properly exhaust his available

administrative remedies regarding his allegations, and his claims are thus procedurally barred pursuant to 42 U.S.C. § 1997e(a).

**B.    Defendants are Entitled to Qualified Immunity**

Defendants are entitled to qualified immunity on all claims. This is because, in addition to the undisputed facts establishing that Martell's constitutional rights were not violated, there is also no case law that would put Defendants on clear notice that their actions violated Martell' constitutional rights.

It is a long-standing principle that governmental officials are shielded from civil liability under the doctrine of Qualified Immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

> The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." The rule of qualified immunity "'provides ample support to all but the plainly incompetent or those who knowingly violate the law.'" "Therefore, *regardless of whether the constitutional violation occurred,* the officer should prevail if the right asserted by the plaintiff was not 'clearly established' or the officer could have reasonably believed that his particular conduct was lawful." Furthermore, "[t]he entitlement is an immunity from suit rather than a mere defense to liability; ... it is effectively lost if a case is erroneously permitted to go to trial."

*Shroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995) (emphasis in original; internal citations omitted).

When conducting the qualified immunity analysis, courts "ask (1) whether the official violated a constitutional right and (2) whether the constitutional right was clearly established." *C.B v. City of Sorona*, 769 F.3d 1005, 1022 (9th Cir. 2014) (internal citation omitted). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). Or "if the law did not put the [official] on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* at 202.

### 1.    Personal Participation

There is no vicarious liability in § 1983 lawsuits. *Iqbal*, 556 U.S. at 676. Hence, a government official—whether subordinate or supervisor—may be held liable under § 1983 only for their "participation" in the alleged constitutional deprivation. *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1069 (9th Cir. 2012). Absent direct participation, a supervisor may only be liable for "setting in motion a series of acts by others," or "knowingly refusing to terminate a series of acts by others, which the supervisor knew or should have known would cause others to inflict a constitutional injury." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1085 (9th Cir. 2013) (no personal participation where there was no evidence that Defendants knew or should have known staff were unaware of and noncompliant with a new CPR policy) (citation and quotation marks omitted).

"Where the defendant's only involvement in the allegedly unconstitutional conduct is the denial of administrative grievances or the failure to act, the defendant cannot be liable under § 1983." *Gates v. LeGrand*, No. 3:16-cv-00321-MMD-CLB, 2020 WL 3867200, at *5 (D. Nev. Mar. 27, 2020) *report and recommendation adopted*, No. 3:16-cv-00321-MMD-CLB, 2020 WL 1890540 (D. Nev. Apr. 16, 2020); *See also Jackson v. Nevada*, No. 216CV00995APGNJK, 2019 WL 6499106, at *8 (D. Nev. Dec. 3, 2019); *Bradberry v. Nevada Dep't of Corr.*, No. 3:11-CV-00668-RCJ, 2013 WL 4702953, at *17 (D. Nev. Aug. 30, 2013) (citing *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (D. Nev. Aug. 30, 2013)) ("A prison official's review and denial of an inmate's grievances, without more, cannot serve as a basis for liability under U.S.C. § 1983."); *Padilla v. Nevada*, No. 3:07-CV-00442-RAM, 2010 WL 3463617, at *2 (D. Nev. Aug. 25, 2010), *aff'd sub nom. Padilla v. Brooks*, 540 F. App'x 805 (9th Cir. 2013) ("Responding to a grievance, in and of itself, does not necessarily mean that [defendants] played a role in the alleged constitutional violations").

Here, there is no evidence Williams was in any way contacted by Martell or Sgt. Clayton regarding Martell's issues with Houck. Ex. N at ¶¶19-20. Rather, Williams only became aware of this incident following review of Martell's grievance in 38728, which postdated both his transfer to SDCC and his release. Ex. I at 2; Ex. N at ¶19. Williams had

no reason to know of any alleged retaliation; thus, her failure to terminate such does not leave her liable for participation. Williams is entitled to summary judgment on the claim against her.

### 2. *Martell's First Amendment Rights were not violated*

Prisoners have a First Amendment right to file prison grievances and civil lawsuits. *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2004). An inmate may establish a First Amendment retaliation claim by proving that "(1) ...a state actor took some adverse action against [him] (2) because of (3) [his] protected conduct, and that such action (4) chilled [his] exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Id.* at 567-68. Total chilling is not required; it is enough if an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities. *Id.* at 568-69.

### 3. *Adverse Action*

Martell cannot establish Defendants' alleged interference with his good time credit grievances was an adverse action. Based upon his convictions for crimes involving violence against a victim, Ex. A & B, Nev. Rev. Stat. §§ 209.4465(1) & (8)(a) only allowed Martell to receive 20 credits per month off the expiration of his sentence, not his parole eligibility date. It is undisputed that he received these credits. Ex. D at ¶12; *See* Ex. E & F. Neither OMD nor any officer or employee of NDOC could have altered the plain language of this statute or amended Martell's convictions in response to his grievances. Ex. D at ¶13. In effect, Martell's good time credit grievances were futile; thus, any action by Houck that interfered with these grievances was not materially adverse.

But there is also no evidence that Houck did in fact interfere with resubmission of Martell's credit calculation grievances. Houck declares that he never interfered with the submission of any inmate's grievance, even those that concerned him. Ex. M at ¶¶7-8. Houck never stated to any inmate that they "would not be going home if [I] had anything to with it." *Id.* at ¶7. No reasonable juror could find that Houck would have reason to

interfere with the availability grievance regarding statutory credits, a topic that had nothing at all to do with him. *See Id*. at ¶¶9-10. Thus, Martell cannot establish any action.

### a.  No retaliatory motive

Martell cannot establish that Defendants' actions, if adverse, were "because of" his conduct, i.e., a retaliatory motive. To prove retaliatory motive, Martell must show "the 'substantial' or 'motivating' factor behind the defendant's conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (quoting *Soranno's Gasco*, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir.1989). Martell must provide evidence that Defendants intended to retaliate. *Id*. It is not enough that the adverse action happened after the protected conduct. *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (to so find would be to "engage in the logical fallacy of *post hoc, ergo propter hoc,* literally, 'after this, therefore because of this.'")

Here, there is no evidence of any retaliatory motive. Houck states that he did not read or have recollection of the contents of Martell's credit calculation grievance, Ex. M at ¶7, such that it could have motivated him to retaliate. Absent proof that Houck knew what the grievances contained, the Martell subsequent failure to resubmit his statutory credit grievances cannot suffice to infer a retaliatory motive.

Nor can a retaliatory motive be inferred from the grievance's content. Neither Grievance 29079 nor 30791 contain any mention of Houck; they are solely focused on the topic of available good time credits. *See* Ex. J & K. Martell's only grievance to name Houck was filed at SDCC. *See* Ex. L. Houck himself states that he did not determine, knows nothing about, and could not opine on the availability of statutory good time credits. *See* Ex. M at ¶¶8-10. For all Houck knew, Martell "had a legitimate reason for bringing the issue to OMD's attention." *Id*. at ¶10. Thus, Martell cannot establish that any adverse action was taken because of his grievance regarding good time credits.

### b.  No chilling effect

Martell cannot establish that a prisoner of ordinary firmness would have been chilled from further speech regarding statutory good time credits. An ordinary inmate would know it is not within the ability of OMD, NDOC, or any individual CCS to change

their criminal convictions or what statutory good time credits their conviction entitles them to. *See* Ex. D at ¶13; Ex. M at ¶8. A reasonable inmate should know that a grievance will not change their conviction or their available statutory good time credit.

Martell filed several grievances without issue after his departure from Unit 2 and HDSP; had he merely filed his grievance again at SDCC, his grievance would likely have been filed without issue. *Cf.* Ex. C & I. While chilling need not be total, *Rhodes*, 408 F.3d at 568-69, there is no indication that the alleged acts would have the tendency to chill an ordinary prisoner's speech. Martell cannot establish that his speech was chilled.

### 4.    *Any Constitutional Violation Was Not Clearly Established*

Defendants are also entitled to protection under the second prong of the qualified immunity analysis. This is because they are entitled to qualified immunity in situations where "the law did not put [them] on notice that [their] conduct would be clearly unlawful." *Saucier*, 533 U.S. at 202.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stanton v. Sims*, 571 U.S. 3, 5-6 (2013) (quoting *Pearson*, 555 U.S. at 231). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law." *Id*. at 6 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 743, 131 (2011)).

Furthermore, "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citation and internal quotation marks omitted). In other words, while courts "'do not require a case directly on point' before concluding that the law is clearly established, . . . 'existing precedent must have placed the statutory or constitutional question beyond debate."' *Stanton*, 571 U.S. at 6 134 (quoting al–Kidd, 563 U.S. at 741). "This 'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their

duties by ensuring that officials can reasonably . . . anticipate when their conduct may give rise to liability for damages." *Id.* (citation and quotation marks omitted). Thus, courts must ask "whether a reasonable officer could have believed that his conduct was lawful." *Dixon v. Wallowa Cnty.*, 336 F.3d 1013, 1019 (9th Cir. 2003).

It is plaintiff's burden to prove that the law was clearly established regarding an alleged constitutional violation at the time of the alleged violation. *See Miller v. Cnty. of Nye*, Case No. 21-16826, 2022 WL 16570782, at *1 (9th Cir. Nov. 1, 2022) (holding that "the plaintiff bears the burden of proving that: (1) taken in the light most favorable to the plaintiff, the facts alleged show that the officers violated a constitutional right; and if so, (2) the right was clearly established at the time of the violation"); *Simmons v. G. Arnett*, 47 F.4th 927, 934–35 (9th Cir. 2022) (holding that to overcome qualified immunity, the "plaintiff bears the burden of proving that the right allegedly violated was clearly established at the time of the violation").

The doctrine of qualified immunity protects the Defendants in this case because they did not undertake actions that could be considered clearly unlawful. As set forth above, Defendants' conduct did not violate Martell's rights under federal law.

Defendants are unable to locate any law in this jurisdiction providing notice that their conduct was considered clearly unlawful. *Saucier*, 533 U.S. at 201. There is no clearly established law that a CSS's actions are adverse, or have any tendency to chill speech, when they thwart an inmates' futile efforts to challenge their criminal conviction or the length of their sentence by institutional grievance. There is no clearly established law in this jurisdiction establishing a person who responds to a grievance well after the fact personally participates in the alleged constitutional violation. Martell cannot meet his burden of proof showing a violation of clearly established law.

Defendants are entitled to qualified immunity because they acted reasonably and were not plainly incompetent. This Court should grant Defendants' Motion for Summary Judgment.

### C.    Martell's Claim is *Heck* Barred

When seeking damages for an allegedly unconstitutional conviction or imprisonment, "a § 1983 Plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determinations, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." *Heck*, 512 U.S. at 487-88. "A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983." Id. at 488. Likewise, a claim for damages for deprivation of good time credits is barred if the deprivation was not previously declared invalid, or if success on the merits of the claim would otherwise imply the invalidity of the deprivation. *See Edwards v. Balisok*, 520 U.S. 641, 646 (1997).

Here, Martell seeks damages in the amount of $100 per day for the alleged extra time he spent in prison, which he alleged was the result of being "unable to challenge his sentence" via grievance. ECF No. 4 at 11. However, Martell has not sought by writ of habeas corpus to establish that this additional time was invalid. Insofar as his claim seeks these damages, his claim for damages is *Heck* barred.

### D.    Martell is Not Entitled to Compensatory or Punitive Damages

#### 1.    *Compensatory Damages*

Notwithstanding *Heck*, Martell cannot prove by preponderance of the evidence that he is entitled to damages—that he spent any additional time in prison because of his failure to grieve his access to good time credits. Rather, it is clear Martell was provided with all the statutory good time credit his convictions allow. *See* Nev. Rev. Stat. § 209.4465(1), (8); Ex. D at ¶¶10-12; Ex. E; Ex. F. Neither OMD nor NDOC deprived him of any available good time credit; and neither OMD nor NDOC could, in response to his grievance, amend his conviction or otherwise allow his good time credits to be calculated toward his parole eligibility date. Nev. Rev. Stat. § 209.4465(1), (8); Ex. D at ¶ 13. Nonetheless, because of his efforts and good behavior, Martell earned enough merit credits and statutory good time credits to be released within less than a year of his incarceration. *Cf.* Ex. A, B, C, E, & F.

Martell cannot prove by preponderance of the evidence that his failure to challenge his sentence in any way enlarged his sentence. No reasonable juror could find that his damages are compensable. Thus, Defendants are entitled to summary judgment on the issue of compensatory damages.

### 2.    Punitive Damages

In Nevada, "punitive damages may be awarded when the plaintiff proves by clear and convincing evidence that the defendant is 'guilty of oppression[;] fraud[;] or malice, express or implied.'" *Peters v. Swift Transportation Co. of Arizona, LLC*, No. 2:19-cv-00874-GMN-EJY, 2023 WL 375985 at *4 (D. Nev. Jan. 23, 2023) (citation omitted); *See also* 9th Cir. Model. Civ. Jury Instrs. 5.5 ("The standard for punitive damages under §1983 mirrors the standard for punitive damages under common law tort cases…. [S]everal states in the Ninth Circuit require proof by clear and convincing evidence before punitive damages are awarded on a state law claim") (quoting *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005)). "'Malice, express or implied' means conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or safety of others." *Russo v. Duracell, Inc.*, No. 2:21-cv-01403-GMN-DJA, 2022 WL 960591 at *3 (D. Nev. Mar. 29, 2022) (*citing* NRS 42.001(3)). "'Conscious disregard' means the knowledge of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid those consequences." *Id.* (*citing* Nev. Rev. Stat. 42.001(1)).

Here, even if summary judgment is denied as to the First Amendment claim, Martell cannot meet the clear and convincing standard necessary for his punitive damages claim to proceed. There is simply no evidence, let alone clear and convincing evidence, that Houck in any way knowingly or intentionally interfered with Martell's ultimately futile grievances regarding good time credits. Likewise, there is no evidence, let alone any clear and convincing evidence, that Williams knew of any alleged retaliation by Houck and knowingly or intentionally did nothing to stop him.

The undisputed facts fail to establish the requisite conscious disregard, and certainly fail to show malice or despicable conduct. Martell himself is responsible for holding up the

grievance process, as he failed to resubmit any of his grievances. Accordingly, Defendants are entitled to summary judgement on the issue of punitive damages.

## VII.   CONCLUSION

This Court should grant Defendants' Motion for Summary Judgment. There is no genuine dispute of material fact, and Martell cannot establish that Defendant Williams participated in any constitutional violation. Martell cannot establish that that Houck acted as alleged, that the alleged actions were adverse, that Houck acted with any retaliatory motive, or that the alleged acts had any tendency to chill Martell's speech. Martell failed to exhaust his administrative remedies, and his claims are procedurally barred. Martell cannot establish he is entitled to compensatory damages by preponderance of the evidence, and his claim is *Heck* barred. Martell cannot establish by clear and convincing evidence that he is entitled to punitive damages. Defendants are entitled to protection for Martell's federal claims under the doctrine of qualified immunity.

DATED this 3rd day of May, 2024.

AARON D. FORD
Attorney General

By: /s/ Samuel L. Pezone Jr.
SAMUEL L. PEZONE JR. (Bar No. 15978)
Deputy Attorney General

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I certify that I am an employee of the State of Nevada, Office of the Attorney General, and that on May 3, 2024, I electronically filed the foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** via this Court's electronic filing system. Parties who are registered with this Court's electronic filing system will be served electronically. For those parties not registered, service was made by depositing a copy for mailing in the United States Mail, first-class postage prepaid, at Las Vegas, Nevada to the following:

Leandre Martell
6077 Chia Avenue
29 Palms, CA 92277
*Plaintiff, Pro Se*

/s/ Andrea Beckett
ANDREA BECKETT, an employee of the
Office of the Nevada Attorney General